149 F.3d 227
 41 Fed.R.Serv.3d 486, 42 Cont.Cas.Fed. (CCH) P 77,347
 *UNITED STATES of America, ex rel., William
St. John LACORTE
v.
SMITHKLINE BEECHAM CLINICAL LABORATORIES, INC.
William St. John LaCorte, relator, Appellant in Nos.
97-1647, 97-1839, 97-1954 and 97-1955.
UNITED STATES of America, ex rel., Jeffrey Scott CLAUSEN
v.
SMITHKLINE BEECHAM CLINICAL LABORATORIES, INC.
Jeffrey Clausen, relator, Appellant in No. 97-1772.
UNITED STATES of America, ex rel., Donald MILLER
v.
SMITHKLINE BEECHAM CLINICAL LABORATORIES, INC.
Donald Miller, relator, Appellant in Nos. 97-1773, 97-1884
and 97-1953.
 Nos. 97-1647, 97-1772, 97-1773, 97-1839, 97-1884, 97-1953,
97-1954 and 97-1955.
 United States Court of Appeals,
Third Circuit.
 Argued June 4, 1998.
Decided July 23, 1998.
 
 Normand F. Pizza (Argued), Nyda S. Brook, Christopher J. Shenfield, Brook, Pizza & Van Loon, L.L.P., New Orleans, Louisiana, for Appellant William St. John LaCorte.
 Charles D. Hood, Jr. (Argued), Daytona Beach, Florida, for Appellant Donald Miller.
 Andrew J. Logan (Argued), Womble Carlyle Sandridge & Rice, PLLC, Winston-Salem, North Carolina; Carol S. Dew, Dew & Smith, LLC, Monroe, Georgia; Kirk W. Watkins, Womble Carlyle Sandridge & Rice, PLLC, Atlanta, Georgia, for Appellant Jeffrey Clausen.
 Marc S. Raspanti (Argued), David M. Laigaie, Tamara L. Traynor, Miller, Alfano & Raspanti, P.C., Philadelphia, Pennsylvania, for Appellee Robert J. Merena.
 John E. Clark, Rand J. Riklin, Goode, Casseb & Jones, San Antonio, Texas, for Appellees Charles Robinson and Glenn Grossenbacher.
 Peter W. Chatfield, Phillips & Cohen, Washington, D.C., for Appellees Kevin Spear, C. Jack Dowden and Berkley Community Law Center.
 Thomas H. Lee, II (Argued), Frederick G. Herold, David J. Caputo, Dechert Price & Rhoads, Philadelphia, Pennsylvania, for SmithKline Beecham Clinical Laboratories, Inc.
 Freddi Lipstein (Argued), Frank W. Hunger, Assistant Attorney General, Michael R. Stiles, United States Attorney, Civil Division, Washington, D.C., for the United States.
 Before: SCIRICA, NYGAARD, and SEITZ, Circuit Judges.
 OPINION OF THE COURT
 NYGAARD, Circuit Judge.
 
 
 1
 This appeal requires us to interpret for the first time 31 U.S.C. § 3730(b)(5), a provision of the False Claims Act intended to prevent duplicative lawsuits. Jeffrey Clausen, William LaCorte and Donald Miller appeal from an order dismissing their False Claims Act suits under section 3730(b)(5) and denying them a share of the proceeds from a settlement based on similar claims alleged in pre-existent lawsuits. We will affirm.
 
 I.
 
 2
 The False Claims Act prescribes civil penalties for knowingly submitting fraudulent claims to the federal government. Under the Act, the United States may bring a civil suit to recover funds lost through such fraudulent transactions. 31 U.S.C. § 3730(a). Of greater relevance for this appeal, the Act's qui tam provisions also allow private plaintiffs ("relators") to sue on the government's behalf and receive a portion of the recovered funds if successful.[1] See, e.g., 31 U.S.C. §§ 3730(b)(1), (c)(3), (d). Before proceeding with the suit, a qui tam plaintiff must disclose to the government the information on which his or her claim is based. The complaint is filed in camera and remains under seal for at least sixty days, during which the United States investigates the claim and decides whether to intervene. 31 U.S.C. § 3730(b)(2). If the government declines to intervene, the qui tam plaintiff may serve the complaint on the defendant and proceed with the action. 31 U.S.C. § 3730(b)(4)(B). However, no qui tam plaintiff may recover for a false claim or share in a government settlement if his or her allegations repeat claims in a previously filed action. 31 U.S.C. § 3730(b)(5).[2]
 
 
 3
 This appeal involves six suits under the qui tam provisions of the False Claims Act. Appellee Robert J. Merena filed the first of these qui tam actions against SmithKline on November 12, 1993 in the Eastern District of Pennsylvania. Appellee Glenn Grossenbacher, later joined by Charles Robinson, Jr., ("the Grossenbacher parties") filed suit in the Western District of Texas on December 15, 1993. Appellees Kevin Spear, C. Jack Dowden and Berkley Community Law Center ("the Spear parties") followed on February 13, 1995 with a suit in the Northern District of California. The Texas and California courts transferred the Spear and Grossenbacher actions to the Eastern District of Pennsylvania for consolidation with Merena's case. For the sake of brevity, these three actions will be referred to collectively as the "original" lawsuits and their plaintiffs as the "original" relators.
 
 
 4
 All three complaints alleged that SmithKline, which operates a nationwide system of clinical laboratories, adopted myriad complicated procedures for the purpose of defrauding state and federal healthcare programs, in particular Medicare and Medicaid. Most of these fraudulent schemes permitted SmithKline to bill the federal government for unauthorized and medically unnecessary laboratory tests. The original relators also alleged that SmithKline used various methods to evade Medicare and Medicaid requirements dictating the maximum level of reimbursement for certain services.
 
 
 5
 Based on its investigation of claims in the original lawsuits, the United States negotiated a $325,000,000 settlement releasing SmithKline for certain false claims made between January 1, 1989 and September 16, 1996. After the government and SmithKline reached this proposed settlement, but before final execution of the settlement agreement, Jeffrey Clausen, Donald Miller and William LaCorte each filed a separate qui tam action (the "later" lawsuits) against SmithKline. Like the original relators, Clausen, LaCorte and Miller alleged that SmithKline intentionally overcharged several government health benefit plans, including the Medicare and Medicaid programs. Although these later cases originated in different parts of the country, they were transferred to the Eastern District of Pennsylvania and reviewed together with the original lawsuits. The later actions were never consolidated with the original suits, however.
 
 
 6
 Under the False Claims Act, the government may settle a qui tam relator's claim over the relator's objections only "if the [trial] court determines, after a hearing, that the proposed settlement is fair, adequate, and reasonable under all the circumstances." 31 U.S.C. § 3730(c)(2)(B). In the district court, Clausen, LaCorte and Miller requested a hearing to challenge the settlement agreement. Appendix ("App.") at 875-972. As a threshold matter, they needed to demonstrate (1) that the settlement covered their claims, and (2) that those claims were not barred by 31 U.S.C. § 3730(b)(5)'s prohibition against subsequent actions based on the same facts underlying a pre-existing False Claims Act lawsuit.
 
 
 7
 After reviewing the parties' submissions, the district court ruled that the settlement agreement included all but one of the later claims, i.e., an allegation in LaCorte's complaint alleging fraudulent billing for urinalysis tests. It also held that this urinalysis claim was the only allegation in the later complaints not barred by section 3730(b)(5). Consequently, the court denied Clausen, Miller and LaCorte a share of the settlement proceeds, but held that LaCorte could pursue a separate suit against SmithKline for damages arising from his urinalysis claim. The trial judge then severed LaCorte's urinalysis claim under Federal Rule of Civil Procedure 21 so that it could proceed as a separate and independent action.[3] However, after Clausen, LaCorte and Miller filed their appeals with this Court, the district court stayed proceedings involving the urinalysis claim pending our decision.[4]
 
 
 8
 Clausen and Miller concede that the settlement agreement covers their claims. They maintain, however, that they should share in the settlement because their claims differ from those of the original relators and therefore escape 31 U.S.C. § 3730(b)(5)'s prohibition against qui tam claims based on facts underlying pending actions. LaCorte makes a slightly different argument, stating that in addition to the urinalysis claim, four other claims included in his complaint are neither covered by the settlement agreement nor barred by 31 U.S.C. § 3730(b)(5). He therefore asserts the right to pursue these four additional claims in his separate suit against SmithKline. In the alternative, he argues that if these claims indeed are covered by the settlement agreement, he should receive a portion of the relator's share.
 
 II.
 
 9
 The district court had jurisdiction under 28 U.S.C. § 1331 and the qui tam provisions of the False Claims Act, 31 U.S.C. §§ 3729-33. We have jurisdiction under 28 U.S.C. § 1291 to review the district court's final judgment as to each of the Appellants.
 
 
 10
 The original relators challenge appellate jurisdiction over Clausen's claims because Clausen filed a notice of appeal only from the district court's July 23, 1997 order dismissing his suit. They contend that this dismissal was not a reviewable final order, and that Clausen instead should have appealed from a later order certifying his claims for appellate review under Federal Rule of Civil Procedure 54(b). We disagree.
 
 
 11
 Unlike the cases of the three original relators, Clausen's suit was never consolidated with any of the other qui tam actions. Thus when the district court dismissed Clausen's appeal with prejudice on July 23, 1997, it did not retain jurisdiction over any part of his case. Therefore the dismissal of Clausen's complaint with prejudice was an appealable final judgment, and we have jurisdiction over Clausen's appeal from that decision. See In re Westinghouse Securities Litig., 90 F.3d 696, 705 & n. 4 (3d Cir.1996).
 
 III.
 
 12
 Before addressing Clausen, LaCorte and Miller's contentions that the trial judge misapplied 31 U.S.C. § 3730(b)(5) to bar their claims, we must determine the proper interpretation of that provision. As with all questions of statutory interpretation, our review is plenary. See United States v. Cross, 128 F.3d 145, 147 (3d Cir.1997), cert. denied sub nom. Cross v. United States, --- U.S. ----, 118 S.Ct. 1519, 140 L.Ed.2d 672 (1998). We begin by examining the statute's language, noting that if Congress unambiguously addressed the issue in question, we may not inquire further. See In re TMI, 67 F.3d 1119, 1123 (3d Cir.1995) (" 'It is axiomatic that statutory interpretation begins with the language of the statute itself ... and if the statutory language is unambiguous, the plain meaning of the words ordinarily is regarded as conclusive.' ").
 
 
 13
 Clausen, Miller and LaCorte urge us to hold that section 3730(b)(5) bars only later qui tam actions arising from facts identical to those underlying a previous suit. For their part, SmithKline, the government and the original relators argue that section 3730(b)(5) bars not only identical claims, but related claims as well. We believe that the statute's plain language resolves this dispute.
 
 
 14
 Section 3730(b)(5) provides that "[w]hen a person brings an action under this subsection, no person other than the Government may intervene or bring a related action based on the facts underlying the pending action." 31 U.S.C. § 3730(b)(5). Giving each word its ordinary meaning, the phrase "related action based on the facts underlying the pending action," clearly bars claims arising from events that are already the subject of existing suits. See, e.g., Hyatt v. Northrop Corp., 883 F.Supp. 484, 485 n. 3 (C.D.Cal.1995) (section 3730(b)(5) "bars qui tam actions based on matters subject to earlier filed actions"). A later case need not rest on precisely the same facts as a previous claim to run afoul of this statutory bar. Rather, if a later allegation states all the essential facts of a previously-filed claim, the two are related and section 3730(b)(5) bars the later claim, even if that claim incorporates somewhat different details. Thus, the district court correctly interpreted the statute as barring a later-filed action alleging the same elements of a fraud described in an earlier suit. See United States ex rel. Merena v. SmithKline Beecham Clinical Laboratories, Inc., Nos. 93-5974, 95-6551, 95-6953, 96-7768, 97-1186, 97-3643, slip op. at 42 (E.D.Pa. July 23, 1997).
 
 
 15
 To support their argument that section 3730(b)(5) applies only to later-filed claims based on identical facts, the later qui tam plaintiffs rely primarily upon the statute's scant legislative history, which states:
 
 
 16
 Subsection (b)(5) of section 3730 further clarifies that only the Government may intervene in a qui tam action. While there are few known instances of multiple parties intervening in past qui tam cases, United States v. Baker-Lockwood Manufacturing Co., 138 F.2d 48 (8th Cir.1943), the Committee wishes to clarify in the statute that private enforcement under the civil False Claims Act is not meant to produce class actions or multiple separate suits based on identical facts and circumstances.
 
 
 17
 S.Rep. No. 99-345, at 25 (1986), reprinted in 1986 U.S.C.C.A.N. 5266, 5290. Clausen, LaCorte and Miller maintain that Congress' reference to "identical facts" requires us to interpret section 3730(b)(5) to allow later qui tam claims that provide new details even if they allege a transaction having the same material elements as a prior cause of action.
 
 
 18
 This argument is unpersuasive for several reasons. First, we may examine a statute's legislative history to determine its meaning only if the text of the statute is ambiguous. See Carteret Sav. Bank, F.A. v. Office of Thrift Supervision, 963 F.2d 567, 578 (3d Cir.1992). As explained above, section 3730(b)(5)'s plain language is conclusive; the statute speaks of a "related action," not an identical one. Thus we need not search the legislative history to determine the Congressional will.
 
 
 19
 Furthermore, even if we found the statutory language ambiguous and therefore considered the Senate's report, the language quoted above would not compel a different interpretation. Although it is possible to read this passage as supporting Clausen, LaCorte and Miller's perspective, other constructions are equally plausible. Nothing suggests that the legislative references to class actions and suits "based on identical facts and circumstances" constitute an exhaustive list of all claims subject to the statutory bar. It is just as likely that these are merely two examples among several types of suits prohibited by the statute.
 
 
 20
 Moreover, we note that interpreting section 3730(b)(5) to bar only suits alleging facts identical to those in previous actions would defeat the law's primary objectives. Section 3730 attempts to reconcile two conflicting goals, specifically, preventing opportunistic suits, on the one hand, while encouraging citizens to act as whistleblowers, on the other. See United States ex rel. Stinson v. Prudential Ins., 944 F.2d 1149, 1154 (3d Cir.1991). When first enacted, the False Claims Act allowed relators to file suits and receive a share of the government's recovery even if they personally did nothing to help expose the alleged fraud. See United States ex rel. Marcus v. Hess, 317 U.S. 537, 545-48, 63 S.Ct. 379, 87 L.Ed. 443 (1943). In the period preceding Congress's first amendment to the Act in 1943, "[q ]ui tam litigation surged as opportunistic private litigants chased after generous cash bounties and, unhindered by any effective restrictions under the Act, often brought parasitic lawsuits copied from preexisting indictments or based upon congressional investigations." United States ex rel. Findley v. FPC-Boron Employees' Club, 105 F.3d 675, 679-80 (D.C.Cir.), cert. denied, --- U.S. ----, 118 S.Ct. 172, 139 L.Ed.2d 114 (1997). In response, Congress amended the False Claims Act in 1943 "to do away with [such] parasitic suits." Pettis ex rel. United States v. Morrison-Knudsen Co., 577 F.2d 668, 671 (9th Cir.1978) (citations and internal quotation marks omitted).
 
 
 21
 Following a decline in qui tam litigation after the 1943 amendment, the legislature again amended the Act in 1986. The primary purpose of this change was to "shift the advantage back to the government" in the fight against fraud. United States ex rel. Springfield Terminal Ry. v. Quinn, 14 F.3d 645, 650 (D.C.Cir.1994). The 1986 amendment, which introduced the current version of section 3730(b)(5), sought to achieve "the golden mean between adequate incentives for whistle-blowing insiders with genuinely valuable information and discouragement of opportunistic plaintiffs who have no significant information to contribute of their own." Id. at 649. In construing section 3730, we are mindful of the need to preserve a balance between the amendment's two competing goals. See, e.g., Stinson, 944 F.2d at 1161.
 
 
 22
 Defining "facts underlying the pending action" as identical facts would upset that balance by unnecessarily handicapping future government efforts to recover fraudulently obtained funds. Under the later plaintiffs' overly narrow interpretation, dozens of relators could expect to share a recovery for the same conduct, decreasing their incentive to bring a qui tam action in the first place. By contrast, interpreting section 3730(b)(5) as imposing a broader bar furthers the Act's purpose by encouraging qui tam plaintiffs to report fraud promptly. See Stinson, 944 F.2d at 1176 (Scirica, J., dissenting) (section 3730(b)(5) creates a " 'race to the courthouse' among eligible relators, [which] may ... spur the prompt reporting of fraud").
 
 
 23
 Further, if the statute barred only claims identical to prior allegations, early filing relators might resist government efforts to keep a suit under seal beyond the sixty-day statutory period out of fear that other plaintiffs might have time to bring additional suits and thereby reduce each relator's share of the qui tam award. This could pose significant problems in cases involving complicated or extensive transactions, where prolonged investigations likely will be necessary.[5] Also, as a matter of fairness claimants alleging the same material facts as prior relators should not share in a qui tam award, because their allegations are unlikely to increase the total recovery. In addition, such duplicative claims do not help reduce fraud or return funds to the federal fisc, since once the government knows the essential facts of a fraudulent scheme, it has enough information to discover related frauds.
 
 
 24
 In a final effort to defend their construction of the statute, Clausen, LaCorte and Miller argue that unless § 3730(b)(5) is limited to suits alleging identical facts, any relator who discovers a false claim will simply plead a very broad cause of action so as to preempt claims by later plaintiffs. We do not believe that the decision we reach today creates an undue risk that plaintiffs will engage in such artful pleading. Federal Rule of Civil Procedure 9(b) requires plaintiffs to plead fraud with particularity, specifying the time, place and substance of the defendant's alleged conduct. See Cooper v. Blue Cross & Blue Shield of Florida, 19 F.3d 562, 567 (11th Cir.1994). This requirement provides sufficient deterrence against overly broad allegations. Moreover, there is no indication that any of the original plaintiffs in this case worded their complaints in excessively general terms for the purpose of thwarting later claims.
 
 IV.
 
 25
 Having determined the proper interpretation of 31 U.S.C. § 3730(b)(5), we now compare Clausen, LaCorte and Miller's claims with the original relators' allegations to determine whether any of the later claims survive the statutory bar.[6] We exercise plenary review over the district court's dismissal of the later complaints, accepting as true all allegations contained therein and drawing all reasonable inferences in the plaintiffs' favor. See Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc., 140 F.3d 478, 483 (3d Cir.1998). After carefully reviewing each of those complaints, we conclude that they merely repeat preexisting causes of action. As a result, section 3730(b)(5) bars all of Clausen, LaCorte and Miller's claims.[7]
 
 A.
 1.
 
 26
 LaCorte argues that four allegations in his original complaint ("Claims 1, 2, 3 and 4") survive section 3730(b)(5)'s restriction. First, he contends that section 3730(b)(5) did not bar Claim 1, which alleged that when physicians ordered a complete blood count ("CBC"), SmithKline also performed an unrequested and medically unnecessary differential (a comparison of white blood cell types) and a platelet count. App. at 234-35, 243. However, the Spear parties alleged that SmithKline "routinely billed government health insurance programs for unordered blood tests." App. at 112. The Spear complaint also explained that the company "provid[ed] and bill[ed] for blood test data that was neither ordered by a physician nor required by the patient's medical condition ... solely to maximize profits illegally at the government's expense." App. at 112. The material elements of this claim are the same as those in LaCorte's Claim 1, i.e., that SmithKline charged government healthcare plans for unrequested blood tests. Accordingly, section 3730(b)(5) bars Claim 1.
 
 2.
 
 27
 LaCorte's Claim 2 also repeats allegations in the original complaints. Claim 2 alleges that SmithKline substituted its more expensive tradename blood profiles when doctors ordered certain standard blood chemistry panels (known as "SMAC," for Simultaneous Multiple Analyzer Computerized and "SMA" for Sequential Multi-analysis).[8] App. at 235-37, 243-44. LaCorte's complaint listed several tests included in the SmithKline tradename profiles, but not in the SMAC, and SMA actually ordered by physicians. He now argues that section 3730(b)(5) does not bar Claim 2 with regard to two of these tests: (1) a 19-profile test substituted for a cheaper 18-profile test, and (2) unnecessary tests for ionized calcium.[9]
 
 
 28
 We disagree. Merena and the Grossenbacher parties pleaded that SmithKline fraudulently billed and marketed blood chemistry profiles. These allegations clearly encompass Claim 2. For instance, Merena alleged that
 
 
 29
 [by] expanding and manipulating its test profiles, performing tests that are not medically necessary, and improperly billing for tests that should have been part of an automated test profile, [SmithKline] has knowingly presented numerous false and fraudulent claims for payment by the government.
 
 
 30
 App. at 188.
 
 
 31
 Additionally, the Grossenbacher parties alleged that SmithKline intentionally structured its order forms so that physicians who wanted a standard eighteen-test SMAC could not tell precisely which tests they had requested and thus would be deceived into ordering unwanted tests at additional expense. App. at 132-35. For instance, paragraph 7 of the Grossenbacher amended complaint states that "[t]o mislead requestors to order unnecessary and excessive testing ... [SmithKline] structures its profiles, its order forms and proprietary code numbers, and its billing procedures such a way that ... it is difficult ... to know precisely what tests are included in[its] profiles, or how much [the government] will be charged...." App. at 132-33. Although the Grossenbacher parties alleged some specific examples of this conduct, they clearly did not intend to provide an exhaustive list of tests improperly included in the SMAC orders. Accordingly, their complaint is broad enough to include Claim 2.
 
 
 32
 In sum, Claim 2 only differs from the Merena and Grossenbacher allegations in that it specifically lists the names of the tests SmithKline improperly added to the SMA and SMAC orders, while the original relators alleged more generally that SmithKline "began separately billing for a whole series of tests," App. at 189, and billed for "several tests not ordinarily included in a standard SMAC profile." App. at 133. This difference is immaterial. Merena and the Grossenbacher parties stated that SmithKline deliberately performed and billed the government for numerous unordered blood chemistry profiles. Thus they have alleged every essential element of Claim 2, and that claim is barred by section 3730(b)(5).
 
 3.
 
 33
 In Claim 3, LaCorte alleged that during phony "screening programs" SmithKline employees drew blood and urine specimens from nursing home patients without informing the patients' physicians. The company then performed unauthorized CBC, hematology, urinalysis and blood chemistry tests on these samples, charging the government for those services. App. at 238-39, 244. SmithKline also sent the United States a bill for drawing and transporting the specimens. App. at 238-40.
 
 
 34
 Section 3730(b)(5) bars this claim because it merely echos the Spear parties' broader allegation that SmithKline billed the United States for unrequested blood tests. LaCorte and the government argue that Claim 3 differs from the Spear parties' claims because Spear did not allege that SmithKline went to nursing homes to gather specimens before it billed for unauthorized blood tests. We do not find this distinction dispositive. The essential facts of Claim 3 are merely that SmithKline tested and billed for blood samples that had not been ordered by any physician. These facts were already the subject of the Spear parties' suit when LaCorte filed his claim. Specifically, the Spear complaint asserted that SmithKline performed and charged for blood testing "that was neither ordered by a physician nor required by the patient's medical condition." App. at 112. This allegation clearly overlaps with Claim 3's material elements and thus is barred by section 3730(b)(5).
 
 4.
 
 35
 Finally, LaCorte's Claim 4 also repeats allegations raised by the original lawsuits. That claim alleges that while pretending to perform audits to verify orders, SmithKline employees surreptitiously gathered data regarding patients' screening tests and blood chemistry panels from their medical charts. App. at 240-43. SmithKline allegedly used this data (1) to generate fraudulent requisition forms appearing to authorize the company's performance of unrequested testing and (2) to design new requisition forms that would mislead medical staff into ordering unneeded tests.
 
 
 36
 The Grossenbacher parties alleged the essential elements of Claim 4 by stating that SmithKline "design[ed] and implement[ed] its standard chemistry profiles, its clinical laboratory requisition forms, and its related practices and procedures in a manner calculated to promote unnecessary chemical testing...." App. at 140. Moreover, the Spear parties' claim that SmithKline performed and billed for blood tests that were neither ordered nor medically necessary also covers Claim 4's material facts.B.
 
 
 37
 We turn next to Clausen's contention that § 3730(b)(5) does not bar two of the allegations in his complaint. First, Clausen asserts that he is the only relator who claimed that SmithKline secretly defrauded the government by redesigning its standard chemical testing profiles to increase Medicare reimbursements. Clausen Br. at 10. He also maintains that no other relator alleged a separate billing scheme with respect to gamma transpeptidase testing ("GGT").
 
 
 38
 Clausen's attempt to distinguish his claims is misguided. First, as noted above, Merena and the Grossenbacher parties alleged that SmithKline used a separate billing scheme for a wide variety of blood chemistry tests. App. at 135-36, 189. We see no meaningful distinction between Clausen's allegation that SmithKline secretly added tests to its profiles to confuse doctors about what they ordered, on the one hand, and Merena's allegations that the company "improperly bill[ed] for tests that should have been part of an automated test profile," on the other. App. at 189. We therefore hold that these earlier allegations encompass Clausen's first claim. Accordingly, that claim is barred by § 3730(b)(5).
 
 
 39
 Second, the original complaints' failure specifically to mention GGT as one of the blood tests for which SmithKline fraudulently billed the government is of no significance. Again, Merena pleaded that SmithKline improperly billed Medicare, Medicaid and CHAMPUS separately for a "whole series of tests" that should have been included in the price for an automated test. Thus Merena's claim states the essential facts of Clausen's allegations regarding GGT. Furthermore, Merena's claim clearly sufficed to give the government notice of SmithKline's false claims for GGT, because the United States sought compensation for that fraud over a year before Clausen filed his suit. App. at 1047, 1051-52.
 
 
 40
 Clausen also argues that it is inconsistent to dismiss his claims but not those of the Grossenbacher and Spear parties, which also overlap with the allegations in the Merena complaint. Clausen is correct that Merena filed his complaint before any of the other consolidated relators, and that § 3730(b)(5) therefore would bar any claims in the Grossenbacher and Spear complaints that repeat Merena's allegations. However, Clausen has no standing to challenge the appropriateness of Grossenbacher's and Spear's portion of the relator's share. See Valley Forge Christian College v. Americans United for Separation of Church & State, Inc., 454 U.S. 464, 474, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) ("[T]he plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.") (citation omitted). Moreover, the status of the Grossenbacher and Spear complaints is irrelevant to our consideration of Clausen's claims. Accordingly, we need not address the question of whether § 3730(b)(5) bars the Grossenbacher or Spear complaints.
 
 C.
 
 41
 We turn next to Miller's allegations. As an initial matter, we must determine whether Miller abandoned his appeal when he sought to adopt the arguments in Clausen's brief rather than filing his own. The original relators contend that although Federal Rule of Appellate Procedure 28(i) permits an appellant to adopt issues raised in a co-appellant's brief, that general rule does not apply to Clausen's legal arguments, which turn on facts unique to Clausen's own case. Their argument finds support in cases holding that "when one appellant raises fact-specific issues, a motion to adopt that appellant's argument, without more, is insufficient to raise that point of error as to the adopting co-appellant." United States v. Elder, 90 F.3d 1110, 1118 (6th Cir.), cert. denied sub nom. Andrews v. United States, --- U.S. ----, 117 S.Ct. 529, 136 L.Ed.2d 415 (1996). See also United States v. Stouffer, 986 F.2d 916, 921 n. 4 (5th Cir.), cert. denied, 510 U.S. 837, 114 S.Ct. 115, 126 L.Ed.2d 80 (1993) (rejecting attempt to incorporate co-defendant's fact-specific legal arguments); United States v. Harris, 932 F.2d 1529, 1533 (5th Cir.1991) (Rule 28(i) motion to adopt co-appellant's argument challenging sufficiency of evidence does not raise that point of error as to the adopting appellant).
 
 
 42
 We decline to apply that rule to this appeal. The cases in which courts have reached this conclusion involved attempts to incorporate by reference a co-defendant's arguments regarding such necessarily fact-specific issue as sufficiency of the evidence. See, e.g., Harris, 932 F.2d at 1533. This case is different because, under the specific circumstances of this appeal, Clausen's arguments are readily transferrable to Miller's case. United States v. David, 940 F.2d 722, 737 (1st Cir.1991) ("Adoption by reference ... cannot occur in a vacuum; to be meaningful, the arguments adopted must be readily transferrable from the proponent's case to the adopter's case."). Miller did not need to raise any fact-specific arguments on appeal because his complaint and those of the previous relators provided all the facts necessary to evaluate his claims. The only dispositive issue in Miller and Clausen's appeals, i.e., the proper definition of § 3730(b)(5), is not fact-specific. In short, had we adopted Clausen's interpretation of § 3730(b)(5) as barring only cases based on "identical facts," we also would have been compelled to reverse the district court's judgment in Miller's appeal.
 
 
 43
 Having rejected that statutory interpretation, however, we conclude that § 3730(b)(5) necessarily bars both of Miller's claims. First, Miller alleged that after learning that Florida's Medicare system planned to stop paying for tests called "calculated values," SmithKline improperly shifted its billings for those tests to Pennsylvania's Medicare system. App. at 265. Miller also claimed that SmithKline "submitted most, if not all, of [its] nationwide billings through centralized billing in Pennsylvania," because Pennsylvania generally reimbursed healthcare services at a higher rate than other states. App. at 267. Merena also pleaded that SmithKline engaged in the prohibited practice of "carrier shopping." Specifically, Merena detailed the company's pattern of shifting bills between Pennsylvania and Florida depending on which system offered higher compensation for particular services. App. at 166-70. Further, Merena explicitly alleged that SmithKline billed the Pennsylvania Medicare system for tests that should have been charged to the Florida system, including certain "calculated values" for hemoglobin indices. App. at 169-70. In short, Merena's complaint fully subsumes all the material elements of Miller's claims.
 
 V.
 
 44
 In light of our decision that § 3730(b)(5) bars all of LaCorte's claims, we need not reach his argument that the settlement agreement did not cover those allegations. Regardless of whether the settlement covers his Claims 1-4, the statutory bar prevents LaCorte from sharing in the settlement award. We likewise need not address his contention that the government must pay prejudgment interest on the settlement proceeds. Because LaCorte has no legal interest in those funds, he lacks standing to raise that argument.
 
 VI.
 
 45
 For the foregoing reasons, we hereby affirm the district court's judgment dismissing Clausen, LaCorte and Miller's claims under 31 U.S.C. § 3730(b)(5). We also note that the district court is now free to enter an order lifting its stay so that LaCorte may begin discovery in the proceedings regarding his urinalysis claim.
 
 
 
 *
 Amended per Clerk's Order of 3/26/98
 
 
 [1]
 "Qui tam " is part of the longer Latin phrase "qui tam pro domino rege quam pro se ipso in hac parte sequitur," which means "who brings the action for the king as well as for himself." See United States ex rel. Stinson v. Prudential Ins., 944 F.2d 1149, 1152 n. 2 (quoting Erickson v. American Inst. of Biological Sciences, 716 F.Supp. 908, 909 n. 1 (E.D.Va.1989) and William Blackstone, Commentaries on the Law of England 160 (1768))
 
 
 [2]
 Section 3730(e) also creates certain jurisdictional bars to qui tam actions, none of which is at issue in this appeal. See, e.g., Stinson, 944 F.2d at 1152 n. 3, 1152-53 (3d Cir.1991)
 
 
 [3]
 Federal Rule of Civil Procedure 21 provides, in pertinent part, that "[a]ny claim against a party may be severed and proceeded with separately." A severed claim proceeds as a discrete suit and results in its own final judgment from which an appeal may be taken. See Abdullah v. Acands, Inc., 30 F.3d 264, 269 (1st Cir.1994)
 
 
 [4]
 Fearing that vital evidence will be destroyed before the appellate process is complete, LaCorte recently asked this Court to issue a writ of mandamus ordering the district court to lift the stay. For several reasons, we decline to address that petition here. First, because the district court order indicated that the stay would last only until such time as we reached a decision in this appeal, discussion of that order is now unnecessary. Second, that petition is before another panel of the court. Finally, because SmithKline and the government concede that the urinalysis claim is neither barred nor settled, that claim is not before us and also will not be at issue in this case should any party challenge this decision
 
 
 [5]
 Indeed, this case exemplifies the importance of extending an investigation under such circumstances. The original complaints revealed a scheme of nationwide fraud spanning several years. Consequently, the United States sought to keep the original complaints under seal beyond the statutorily required sixty days, and the district court granted the additional time without objection from any of the original relators. Based on its investigation, the government was able to negotiate a settlement in a relatively short period of time, thereby avoiding the cost and delay of litigation. Had they anticipated that the qui tam award would be reduced if other plaintiffs stepped forward with similar claims, however, the original relators might well have opposed the government's request for additional time
 
 
 [6]
 Because we may decide whether the later complaints allege the same material elements as claims in the original lawsuits simply by comparing the original and later complaints, further factual development is unnecessary. We therefore reject LaCorte's suggestion that we remand his claims to the district court for discovery before deciding whether they are barred by section 3730(b)(5)
 
 
 [7]
 We express no opinion as to LaCorte's urinalysis claim, which the district court determined was neither settled nor barred by section 3730(b)(5). As previously explained, supra n. 4, that claim is not at issue in this appeal because neither SmithKline nor the United States contests the trial court's decision regarding LaCorte's urinalysis allegations
 
 
 [8]
 In their appellate brief, the original relators state that the acronym "SMAC" indicates "serial multichannel automated chemistry." Br. of Appellees Merena, Robinson, Grossenbacher & Spear et al. at 21. Because no party contends that there is more than one SMAC panel however, this difference in semantics is immaterial
 
 
 [9]
 In his brief to this Court, LaCorte argued that only the 19-profile test and the ionized calcium test were not included in the settlement. However, the portion of his brief dedicated to his argument under section 3730(b)(5) did not specify any particular tests, but referred to his earlier contentions regarding the 19-profile test and the ionized calcium test. Thus LaCorte effectively conceded that the other tests included in Claim 2 are barred by 31 U.S.C. § 3730(b)(5). We note, however, that the outcome would be the same even if the additional tests mentioned in Claim 2 were before us